Statement of case.

AMOS ROBBINS and ELI ROBBINS, Respondents,

*v.*

STEPHEN D. DILLAYE and HENRY A. DILLAYE, Appellants.

THE SAME, Respondents,

*v.*

HENRY A. DILLAYE, STEPHEN D. DILLAYE and FREDERICK C. DILLAYE, Appellants.

In cases of usury it is a question for the jury, under proper instruction from the court (*Sizer* v. *Miller*, 1 Hill, 227), whether there was any intention to evade the laws against it. But it seems that if the case is such that the court would be bound to grant a new trial if the jury found otherwise, then a nonsuit or verdict would ordinarily be sustained.

Where counsel presented a theoretical proposition which was assented to by the court, with the remark that he should charge thereafter as to the law of the case, there is no ground for an exception.

Where uncurrent money is applied for and received by the borrower as being equally good for his purposes with current, the transaction is not therefore necessarily free from usury. The defendants' contract or agreement to pay usury in any form could not repeal the statute.

Where there is no pretense of oversight, mistake or inadvertence a party must be held to have intended to do what he has done.

## *Appeal from General Term.*

APPEAL from judgments in two actions tried together at the New York circuit, in May, 1858, the defense being the same in each. At the circuit the judgments were rendered for the defendants, which, on appeal, were reversed at the General Term and new trials ordered. The defendants appealed from the judgments of the General Term, reversing the judgment of the circuit, and ordering new trials, to this court.

The complaints are upon promissory notes made by the defendant, Stephen D. Dillaye, indorsed by the other defendants, and given by the maker to the firm of S. Leland & Co., who sold them to the plaintiffs.

The defense set up in the answer was, that the notes were given to S. Leland & Co., upon a usurious agreement that they should loan Stephen D. Dillaye five thousand dollars for one year, in bills of the Valley Bank of Hagerstown, then at a discount of one per cent, upon his own notes, indorsed by the other defendants, at ninety days, payable in New York; that he should pay his notes and make new ones, to be discounted in the same Valley Bank bills, Stephen D. Dillaye to give them a good circulation.

On the trial, the facts above stated were proved, and that the Valley Bank notes given were marked, for the purpose of showing what circulation they got.

That S. Leland & Co., for some time before, and during the time the loans were made, were stockholders of the Valley Bank, and had an average discount of twenty thousand dollars to twenty-five thousand dollars from it; that they had an agreement with John Thompson, a broker in uncurrent bills, that he should redeem the Valley Bank notes at his office in New York, at one per cent discount, they each day taking them from him at three-quarters of one per cent discount, so as to leave him one-quarter and S. Leland & Co. three-quarters of one per cent discount; that under this agreement he daily redeemed from two thousand to four thousand dollars of these notes, which they, at two o'clock each day, took from him.

It was also shown that S. Leland & Co. were in the habit of loaning this money upon notes payable at New York banks.

The bills of the Valley Bank were never at par, but kept at one per cent on New York, although they would pass in ordinary transactions. After the discount of the last note, and before S. D. Dillaye had passed the Valley Bank notes received upon it, the bank failed.

Nothing was said as to interest or as to the rate at which Dillaye should take the money, but an account, after same notes were given, was rendered Dillaye by

Leland, in which he had uniformly charged seven per cent, and deducted that sum in advance. When Dillaye applied for the loan he applied for bills of the Valley Bank, and told Leland he could make them answer his purpose perfectly well.

Leland testified that the matter of interest was not mentioned or thought of in the transactions with Dillaye; that was no part of his object to stipulate for any particular amount of interest.

*B. G. Hitchings*, for respondents.

'Wm. Tracy', for appellants.

Peckham, J.    At the close of the testimony the plaintiff's counsel requested the court to charge several propositions. First. "That the loaning of money in uncurrent bills, which are at a discount, and taking a note therefor at par, with legal interest thereon, is not *per se*, a usurious transaction. In order to make it usurious, there must be the intention, by giving uncurrent or depreciated moneys, instead of current, to get more than legal interest for the use of the money."

The court charged that the proposition was correct in general and in ordinary transactions, that each case depended upon its own facts, and he should thereafter state the rule of law applicable to the facts of this case. Exception by plaintiffs. I see no ground for this exception. The counsel presented a theoretical proposition which was assented to by the judge, with the remark that he should charge thereafter, as to the law of this case.

Second. "That if the uncurrent money was applied for and received by the borrower as being equally good for his purposes with current, he cannot sustain the defense of usury." This the judge declined to charge and I think correctly. If it were so applied for and so received, the transaction is not therefore necessarily free from usury.

There are some circumstances in this case proper for the consideration of a jury, as to the real understanding of the parties to this loan.

It might have been well understood by Dillaye that he could not borrow this money unless he made such statement; that Leland & Co. would not loan it otherwise, for fear of the usury laws. It being a part of their business to loan this money and have it so redeemed, they would not loan it unless in form, at least, the usury laws could be avoided. For some two years they had redeemed this money, as appeared by the testimony of the broker, Thompson, at one per cent, paying Thompson for his services one-fourth of one per cent, and realizing thus somewhere near twenty-five dollars per day, as the redemptions averaged from two to four thousand dollars a day. It is true, Leland testified that he acted as agent in that redemption. It appeared that Dillaye, living at Syracuse, went to New York to negotiate this loan. It also appeared that Dillaye, before he furnished the loans, was unable to use the money without a sacrifice. The question for the jury was, what was the reality of the transaction, not what was its form; what was the real understanding and purpose of the parties?

A man might notoriously have money to loan on condition that the borrower purchased an old cart at fifty dollars, not worth over fifteen dollars; every man who expected to be successful in his application to borrow money, would be in want of just such a cart, and would be willing to pay fifty dollars for it, desirous of getting it at that price.

The question for the jury would be, not whether the borrower offered voluntarily to take the cart at its great excess of value, and so received it, but whether, in truth and good faith, that was the reality of the transaction, or was it really a mode of getting more than seven per cent for the loan, and adopted for that purpose by the understanding of the parties? In the latter case, I think, it

would clearly be usury. The cases referred to on the argument, sustain this view, at least they do not conflict with it. *Bank of U. S.* v. *Waggoner*, 9 Peters, 378; *Stuart* v. *Mechanics' Bank*, 9 Johns., 496; *Codd* v. *Rathbone*, 19 N. Y., 37; *Thomas* v. *Murray*, 32 id., 609; *Cleveland* v. *Laden*, 7 Paige, 557.

Third. "That if it was no part of the object or intention of Leland & Co., in making the loan, to get more than seven per cent for the use of the money, and if more was received, it happened unintentionally and from oversight, the transaction was not usurious." As to this proposition, the judge charged that it was correct, and he adopted it, but " that the parties must be held to have intended to do what they did." Exception. I can see no objection to this. The proposition was assented to and adopted, with the addition, " that they intended to do what they did."

Is there any pretense of a mistake by either party? What was the " oversight," in this case? True, Mr. Leland testified that the matter of interest was not "mentioned or thought of," but he spoke of no oversight, mistake, or inadvertence. He can specify none. If interest was not thought of, what was thought of? He did not know, but he believed the bank redeemed in Maryland, in gold and silver. Leland & Co. were in the habit of having about one-quarter of its capital, by way of discount; were making a large daily income by its redemption; were regular dealers in the money, in both loans and redemptions, and yet they had no thought about interest or the rate of interest. What did they think of? It is clear that neither thought of any less rate of interest than seven per cent. Leland so made out the account, and Dillaye never objected to it. What then was the oversight? There can be no pretense of any.

Fourth. "That there could be no usury, unless there was a corrupt agreement, intentionally to get more than seven per cent for the use of the money."

The judge refused to charge, except with the qualification, " that if the parties made such an agreement as they intended to make, and by it the lender received, and the borrower pays, more than seven per cent, the transaction is usurious, although the parties had no intention of violating the usury laws." Exception.   He also charged, " that if the notes in suit were given under an arrangement that they were for bills of the Valley Bank, at par, when they were known to be at a discount, then they must find for the defendants."   Again : " If Leland made such an agreement as he intended to make, and the effect of it was that he would get more than seven per cent for the use of his money, the transaction was usurious, though he may not have intended to get more than seven per cent."

Upon these points the question in this case depends.

The case, as finally disposed of by the court, was substantially a direction to the jury to find for the defendants.

It was proved, and not denied, that these notes were given for bills of the Valley Bank at par, when they were known to be at a discount.   There was no sort of dispute as to that.   In that case the court directed the jury to find for the defendants.

If this were a new question, I should hold the charge barred as matter of law upon those conceded facts.

The application was not to purchase these bills.   It was in no sense a purchase.   It was an application for a loan to be renewed three times.   Each time in this Valley Bank money, it was made.   That these bills were at a discount at the place where the agreement for the loan was made, is admitted and was known to both parties.   In such case, Chancellor WALWORTH held it was usury.   " If it was part of the agreement for the loan in this case that the complainant should take uncurrent bills at a higher rate than their actual value, and for more than they were worth to either party in cash or current funds, the loan was usurious, though the complainant intended to impose

upon his workmen, by paying them in depreciated currency." *Cleveland* v. *Loder*, 7 Paige, 558. It was usury, though the borrower could and did impose on his workmen by passing them off as current.

It is by no means a certain shield from usury that Dillaye stated he could use them as well as if they were current, and for that reason he would take the loan in those bills. It is simply absurd to say that they were worth as much to him as current money. If he could pay out a large amount of uncurrent money in his business, he could easily purchase it if he had the money, and himself make the discount, or a part at least of the one per cent.

The statements of Dillaye did not change or in any manner affect the value of these bills.

Whatever he might say or do, would not affect the validity of this loan. The true question was, what was their actual cash value at the time and place of this contract of loan?

The defendant's contract or agreement to pay usury in any form could not repeal the statute.

The case of *Stuart* v. *The Mechanics' and Farmers' Bank*, 19 Johns., 496, is relied upon by the plaintiffs, but I do not think it aids them, though that case, in my opinion, went to the very border line. There, however, Chief Justice SPENCER, who delivered the opinion of the court, went upon the ground that there was no evidence in the case that the bank knew that the bills of the Bank of Niagara (which formed part of the loan) were not perfectly good, nor was there any proof that they were under par at Albany where the loan was made. Therefore the chief justice (see the case, pp. 509, 511) said, "The question was whether the respondents, under the device of lending part in the bills of their own bank, and part in the bills of the Bank of Niagara, have, in effect, intentionally and knowingly taken more than at the rate of six per cent. I say knowingly and intentionally; for it cannot be pre-

tended that, unless the respondents knew that the bills of the Niagara Bank were depreciated and not intrinsically worth their nominal amount, and intentionally put them off at their nominal value, with such knowledge, it would be a case of usury."

Here, on the contrary, it was known and conceded that these bills were at a discount where the contract was made, and the lender knowingly and intentionally loaned them at par.

The chief justice further observes in that case : " I am not to be understood that the consent of the borrower to pay a higher rate of interest than the law allows, would have the least effect to render the transaction legal ; yet, where goods, or the notes of a bank or a third person, constitute part of the loan, and the value of such notes or goods was uncertain and fluctuating, a voluntary and spontaneous proposition to receive, on a loan, part money and part in such goods or notes made by a person whose credit stood well, would not seem to be usurious."

The notes of this Valley Bank were neither " uncertain or fluctuating." They were always at one per cent discount, at least, until the bank failed and became insolvent.

The decision of the chancellor above quoted was in accordance with the case of *Gaither* v. *The Farmers' Bank of Georgetown*, 4 Pet. U. S., 57

But that court, in *Bank of U. S.* v. *Wagoner*, 9 Peters U. S., 378, made a decision and proclaimed doctrine which may be regarded as at war with the charge of the judge in the case at bar. Where the banks had discounted a note for five thousand dollars, and paid the amount partly in bills of the Bank of Kentucky, and partly in a check on that bank. The Bank of Kentucky was then indebted in over ten thousand dollars to the United States Bank. Its notes were at a discount of from thirty-three to forty per cent, but were receivable at par for some taxes in Kentucky. It had suspended specie payment, but paid in specie where coerced at law, and previous to the

commencement of that suit it had paid its entire debt and interest to the United States Bank. The court reversed the judgment of the State Court for the defendants, holding it a question for the jury whether there was any intention to evade the laws against usury. "Did the parties intend usury and make use of a shift or device to cover a loan of money? Or did they *bona fide* intend a loan of bank notes, which to the lender were of the full value of their numerical amount, and were so treated *bona fide* by the borrower"? That is a *bona fide* transaction, and the Bank of Kentucky was regarded as sound and able to pay by both parties, it may have been a mere exchange of securities, where both were available and of equal value, and hence a valid transaction.

The Bank of the United States was not in the habit of making loans and discounts in the notes of the Bank of Kentucky. It refused to do so in that case twice, but, on consultation with the bank at Philadelphia it made the loan. In the case before this court it was a part of the business of the lenders to make loans. Four several repeated loans of these same bills were to be, and were, made to Dillaye in this transaction. It is not denied that parties can *bona fide* buy and sell at such prices as may be agreed upon, but they cannot borrow except within certain limits. I confess I am unable to see anything in this case, except a mere loan — nothing of what is termed "an exchange," or may be called a trade of securities or of a purchase of these Valley Bank notes. Yet the doctrine of this case in 9 Peters was partially adopted by the chancellor in *Pratt* v. *Adams*, 7 Paige, 615, so far as to allow claims otherwise usurious to be placed in a class of debts that never could be reached by the assigned assets.

The question of usury on authority, in cases of this sort may, perhaps, be admitted as one of intent, and, therefore, for the jury, but with proper instructions from the court. *Sizer* v. *Miller*, 1 Hill, 227.

The only question in my mind in this case is, whether the court would not be bound to grant a new trial if the jury had found for the plaintiffs.

If it would, then a nonsuit or verdict ordered for the defendant would ordinarily be sustained.

In the case of the *Bank* v. *Wagoner, supra,* suppose it had appeared that the Bank of the United States had been in the habit, for some two years, of buying in the Kentucky bills at from thirty-three to forty per cent discount, and loaning them out at par, could there have been any doubt that the transaction was usurious?

That case, with the facts thus added, illustrates the principle of this. The only distinction being the difference in the amount of the discount.

The case of *Thomas* v. *Murray,* 32 N. Y., 605, does not affect this question. There the lender did not know or have reason to believe, as the jury found, that the note constituting part consideration for the loan, was not collectible. In such case the court charged that the transaction was not usurious, though the note proved to be worthless. And this court sustained the charge.

Here the application was for a loan. It was a loan in terms as well as in fact. It was by agreement for notes in fact, at a discount of one per cent in the market where the loan was made, and that fact known to both parties. The transaction accorded with the ordinary course of business of the lenders. To my mind, this makes a case of usury. In *The Bank of Utica* v. *Wager,* 2 Cow., 712, where it was plain that the bank never intended to take usury in one sense, that is, its officers, in common with the officers of all other banks in the State, then supposed they had a right to call ninety days a quarter of a year, and take interest accordingly, the court held that mode of counting interest to be against the law, as it was clearly contrary to the fact, and that a note for ninety days, upon which interest had been taken, was usurious and void. Chief Justice Savage in that case remarked, that " the

receiving usurious interest intentionally is sufficient evidence of a corrupt agreement, does not need an authority to support it."

In deference to authority at page 769, a majority of my brethren affirm this judgment for the error of the court in not properly submitting the case to the jury.

All concur except Smith and Morgan, JJ., who do not vote.

Judgment affirmed.